# CITY OF CANTON, OHIO *v.* HARRIS ET AL.

No. 86–1088.   Argued November 8, 1988—Decided February 28, 1989

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, MARSHALL, BLACKMUN, and STEVENS, JJ., joined, and in Parts I, II, and III of which O'CONNOR, SCALIA, and KENNEDY, JJ., joined, except as to n. 11.   BRENNAN, J., filed a concurring opinion, *post*, p. 393.   O'CONNOR, J., filed an opinion concurring in part and dissenting in part, in which SCALIA and KENNEDY, JJ., joined, *post*, p. 393.

*Carter G. Phillips* argued the cause for petitioner.   With him on the briefs were *Mark D. Hopson, W. Scott Gwin, William J. Hamann,* and *John S. Coury.*

*David Rudovsky* argued the cause for respondent.   With him on the brief were *Emanuella Harris Groves* and *Dexter W. Clark.* *

JUSTICE WHITE delivered the opinion of the Court.

In this case, we are asked to determine if a municipality can ever be liable under 42 U. S. C. § 1983 [1] for constitutional violations resulting from its failure to train municipal employees.   We hold that, under certain circumstances, such liability is permitted by the statute.

---

*Benna Ruth Solomon, Beate Bloch,* and *Richard K. Willard* filed a brief for the International City Management Association et al. as *amici curiae* urging reversal.

*John A. Powell, Steven R. Shapiro, Howard A. Friedman,* and *Michael Aaron Avery* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

[1] Title 42 U. S. C. § 1983 provides, in relevant part, that:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

## I

In April 1978, respondent Geraldine Harris was arrested by officers of the Canton Police Department. Mrs. Harris was brought to the police station in a patrol wagon.

When she arrived at the station, Mrs. Harris was found sitting on the floor of the wagon. She was asked if she needed medical attention, and responded with an incoherent remark. After she was brought inside the station for processing, Mrs. Harris slumped to the floor on two occasions. Eventually, the police officers left Mrs. Harris lying on the floor to prevent her from falling again. No medical attention was ever summoned for Mrs. Harris. After about an hour, Mrs. Harris was released from custody, and taken by an ambulance (provided by her family) to a nearby hospital. There, Mrs. Harris was diagnosed as suffering from several emotional ailments; she was hospitalized for one week and received subsequent outpatient treatment for an additional year.

Some time later, Mrs. Harris commenced this action alleging many state-law and constitutional claims against the city of Canton and its officials. Among these claims was one seeking to hold the city liable under 42 U. S. C. § 1983 for its violation of Mrs. Harris' right, under the Due Process Clause of the Fourteenth Amendment, to receive necessary medical attention while in police custody.

A jury trial was held on Mrs. Harris' claims. Evidence was presented that indicated that, pursuant to a municipal regulation,[2] shift commanders were authorized to determine, in their sole discretion, whether a detainee required medical

---

[2] The city regulation in question provides that a police officer assigned to act as "jailer" at the city police station

"shall, when a prisoner is found to be unconscious or semi-unconscious, or when he or she is unable to explain his or her condition, or who complains of being ill, have such person taken to a hospital for medical treatment, with permission of his supervisor before admitting the person to City Jail." App. 33.

care. Tr. 2–139—2–143. In addition, testimony also suggested that Canton shift commanders were not provided with any special training (beyond first-aid training) to make a determination as to when to summon medical care for an injured detainee. *Ibid.;* App. to Pet. for Cert. 4a.

At the close of the evidence, the District Court submitted the case to the jury, which rejected all of Mrs. Harris' claims except one: her § 1983 claim against the city resulting from its failure to provide her with medical treatment while in custody. In rejecting the city's subsequent motion for judgment notwithstanding the verdict, the District Court explained the theory of liability as follows:

> "The evidence construed in a manner most favorable to Mrs. Harris could be found by a jury to demonstrate that the City of Canton had a custom or policy of vesting complete authority with the police supervisor of when medical treatment would be administered to prisoners. Further, the jury could find from the evidence that the vesting of such *carte blanche* authority with the police supervisor without adequate training to recognize when medical treatment is needed was grossly negligent or so reckless that future police misconduct was almost inevitable or substantially certain to result." *Id.,* at 16a.

On appeal, the Sixth Circuit affirmed this aspect of the District Court's analysis, holding that "a municipality is liable for failure to train its police force, [where] the plaintiff . . . prove[s] that the municipality acted recklessly, intentionally, or with gross negligence." *Id.,* at 5a.[3] The Court of Appeals also stated that an additional prerequisite of this theory

---

[3] In upholding Mrs. Harris' "failure to train" claim, the Sixth Circuit relied on two of its previous decisions which had approved such a theory of municipal liability under § 1983. See *Rymer* v. *Davis,* 754 F. 2d 198, vacated and remanded *sub nom. Shepherdsville* v. *Rhymer,* 473 U. S. 901, reinstated, 775 F. 2d 756, 757 (1985); *Hays* v. *Jefferson County,* 668 F. 2d 869, 874 (1982).

of liability was that the plaintiff must prove "that the lack of training was so reckless or grossly negligent that deprivations of persons' constitutional rights were substantially certain to result." *Ibid.* Thus, the Court of Appeals found that there had been no error in submitting Mrs. Harris' "failure to train" claim to the jury. However, the Court of Appeals reversed the judgment for respondent, and remanded this case for a new trial, because it found that certain aspects of the District Court's jury instructions might have led the jury to believe that it could find against the city on a mere *respondeat superior* theory. Because the jury's verdict did not state the basis on which it had ruled for Mrs. Harris on her § 1983 claim, a new trial was ordered.

The city petitioned for certiorari, arguing that the Sixth Circuit's holding represented an impermissible broadening of municipal liability under § 1983. We granted the petition. 485 U. S. 933 (1988).

## II

We first address respondent's contention that the writ of certiorari should be dismissed as improvidently granted, because "petitioner failed to preserve for review the principal issues it now argues in this Court." Brief for Respondent 5.

We think it clear enough that petitioner's three "Questions Presented" in its petition for certiorari encompass the critical question before us in this case: Under what circumstances can inadequate training be found to be a "policy" that is actionable under § 1983? See Pet. for Cert. i. The petition itself addressed this issue directly, attacking the Sixth Circuit's "failure to train" theory as inconsistent with this Court's precedents. See *id.*, at 8–12. It is also clear—as respondent conceded at argument, Tr. of Oral Arg. 34, 54—that her brief in opposition to our granting of certiorari did not raise the objection that petitioner had failed to press its claims on the courts below.

As to respondent's contention that the claims made by petitioner here were not made in the same fashion below, that

failure, if it occurred, does not affect our jurisdiction; and because respondent did not oppose our grant of review at that time based on her contention that these claims were not pressed below, we will not dismiss the writ as improvidently granted. "[T]he 'decision to grant certiorari represents a commitment of scarce judicial resources with a view to deciding the merits . . . of the questions presented in the petition.'" *St. Louis* v. *Praprotnik*, 485 U. S. 112, 120 (1988) (quoting *Oklahoma City* v. *Tuttle*, 471 U. S. 808, 816 (1985)). As we have expressly admonished litigants in respondent's position: "Nonjurisdictional defects of this sort should be brought to our attention *no later* than in respondent's brief in opposition to the petition for certiorari; if not, we consider it within our discretion to deem the defect waived." *Tuttle, supra,* at 816.

It is true that petitioner's litigation posture with respect to the questions presented here has not been consistent; most importantly, petitioner conceded below that "'inadequate training' [is] a means of establishing municipal liability under Section 1983." Reply Brief for Petitioner 4, n. 3; see also Petition for Rehearing in No. 85–3314 (CA6), p. 1. However, at each stage in the proceedings below, petitioner contested any finding of liability on this ground, with objections of varying specificity. It opposed the District Court's jury instructions on this issue, Tr. 4–369; claimed in its judgment notwithstanding verdict motion that there was "no evidence of a . . . policy or practice on the part of the City . . . [of] den[ying] medical treatment to prisoners," Motion for Judgment Notwithstanding Verdict in No. C80–18–A (ND Ohio), p. 1; and argued to the Court of Appeals that there was no basis for finding a policy of denying medical treatment to prisoners in this case. See Brief for Appellant in No. 85–3314 (CA6), pp. 26–29. Indeed, petitioner specifically contended that the Sixth Circuit precedents that permitted inadequate training to be a basis for municipal liability on facts similar to these, see n. 3, *supra*, were in conflict with

·our decision in *Tuttle*. Brief for Appellant in No. 85–3314 (CA6), p. 29. These various presentations of the issues below might have been so inexact that we would have denied certiorari had this matter been brought to our attention at the ·appropriate stage in the proceedings. But they were at least adequate to yield a decision by the Sixth Circuit on the questions presented for our review now.

Here the Sixth Circuit held that where a plaintiff proves that a municipality, acting recklessly, intentionally, or with gross negligence, has failed to train its police force—resulting in a deprivation of constitutional rights that was "substantially certain to result"— § 1983 permits that municipality to be held liable for its actions. Petitioner's petition for certiorari challenged the soundness of that conclusion, and respondent did not inform us prior to the time that review was granted that petitioner had arguably conceded this point below. Consequently, we will not abstain from addressing the question before us.

### III

In *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978), we decided that a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983. *Id.*, at 694–695. "It is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable under § 1983." *Springfield* v. *Kibbe*, 480 U. S. 257, 267 (1987) (O'CONNOR, J., dissenting) (quoting *Monell, supra*, at 694).

Thus, our first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation. The inquiry is a difficult one; one that has left this Court deeply divided in a series of

cases that have followed *Monell;*[4] one that is the principal focus of our decision again today.

## A

Based on the difficulty that this Court has had defining the contours of municipal liability in these circumstances, petitioner urges us to adopt the rule that a municipality can be found liable under § 1983 only where "the policy in question [is] itself unconstitutional." Brief for Petitioner 15. Whether such a rule is a valid construction of § 1983 is a question the Court has left unresolved. See, *e. g., St. Louis* v. *Praprotnik, supra,* at 147 (BRENNAN, J., concurring in judgment); *Oklahoma City* v. *Tuttle, supra,* at 824, n. 7. Under such an approach, the outcome here would be rather clear: we would have to reverse and remand the case with instructions that judgment be entered for petitioner.[5] There can be little doubt that on its face the city's policy regarding medical treatment for detainees is constitutional. The policy states that the city jailer "shall . . . have [a person needing medical care] taken to a hospital for medical treatment, with

---

[4] See, *e. g., St. Louis* v. *Praprotnik,* 485 U. S. 112 (1988); *Springfield* v. *Kibbe,* 480 U. S. 257 (1987); *Los Angeles* v. *Heller,* 475 U. S. 796 (1986); *Oklahoma City* v. *Tuttle,* 471 U. S. 808 (1985).

[5] In this Court, in addition to suggesting that the city's failure to train its officers amounted to a "policy" that resulted in the denial of medical care to detainees, respondent also contended the city had a "custom" of denying medical care to those detainees suffering from emotional or mental ailments. See Brief for Respondent 31–32; Tr. of Oral Arg. 38–39. As respondent described it in her brief, and at argument, this claim of an unconstitutional "custom" appears to be little more than a restatement of her "failure-to-train as policy" claim. See *ibid.*

However, to the extent that this claim poses a distinct basis for the city's liability under § 1983, we decline to determine whether respondent's contention that such a "custom" existed is an alternative ground for affirmance. The "custom" claim was not passed on by the Court of Appeals—nor does it appear to have been presented to that court as a distinct ground for its decision. See Brief of Appellee in No. 85–3314 (CA6), pp. 4–9, 11. Thus, we will not consider it here.

permission of his supervisor . . . ." App. 33. It is difficult to see what constitutional guarantees are violated by such a policy.

Nor, without more, would a city automatically be liable under § 1983 if one of its employees happened to apply the policy in an unconstitutional manner, for liability would then rest on *respondeat superior*. The claim in this case, however, is that if a concededly valid policy is unconstitutionally applied by a municipal employee, the city is liable if the employee has not been adequately trained and the constitutional wrong has been caused by that failure to train. For reasons explained below, we conclude, as have all the Courts of Appeals that have addressed this issue,[6] that there are limited circumstances in which an allegation of a "failure to train" can be the basis for liability under § 1983. Thus, we reject petitioner's contention that only unconstitutional policies are actionable under the statute.

---

[6] In addition to the Sixth Circuit decisions discussed in n. 3, *supra*, most of the other Courts of Appeals have held that a failure to train can create liability under § 1983. See, *e. g.*, *Spell* v. *McDaniel*, 824 F. 2d 1380, 1389–1391 (CA4 1987); *Haynesworth* v. *Miller*, 261 U. S. App. D. C. 66, 80–83, 820 F. 2d 1245, 1259–1262 (1987); *Warren* v. *Lincoln*, 816 F. 2d 1254, 1262–1263 (CA8 1987); *Bergquist* v. *County of Cochise*, 806 F. 2d 1364, 1369–1370 (CA9 1986); *Wierstak* v. *Heffernan*, 789 F. 2d 968, 974 (CA1 1986); *Fiacco* v. *Rensselaer*, 783 F. 2d 319, 326–327 (CA2 1986); *Gilmere* v. *Atlanta*, 774 F. 2d 1495, 1503–1504 (CA11 1985) (en banc); *Rock* v. *McCoy*, 763 F. 2d 394, 397–398 (CA10 1985); *Languirand* v. *Hayden*, 717 F. 2d 220, 227–228 (CA5 1983). Two other Courts of Appeals have stopped short of expressly embracing this rule, and have instead only implicitly endorsed it. See, *e. g.*, *Colburn* v. *Upper Darby Township*, 838 F. 2d 663, 672–673 (CA3 1988); *Lenard* v. *Argento*, 699 F. 2d 874, 885–887 (CA7 1983).

In addition, six current Members of this Court have joined opinions in the past that have (at least implicitly) endorsed this theory of liability under § 1983. See *Oklahoma City* v. *Tuttle*, *supra*, at 829–831 (BRENNAN, J., joined by MARSHALL and BLACKMUN, JJ., concurring in part and concurring in judgment); *Springfield* v. *Kibbe*, *supra*, at 268–270 (O'CONNOR, J., joined by REHNQUIST, C. J., and Powell and WHITE, JJ., dissenting).

## B

Though we agree with the court below that a city can be liable under § 1983 for inadequate training of its employees, we cannot agree that the District Court's jury instructions on this issue were proper, for we conclude that the Court of Appeals provided an overly broad rule for when a municipality can be held liable under the "failure to train" theory. Unlike the question whether a municipality's failure to train employees can ever be a basis for § 1983 liability—on which the Courts of Appeals have all agreed, see n. 6, *supra*,—there is substantial division among the lower courts as to what *degree of fault* must be evidenced by the municipality's inaction before liability will be permitted.[7] We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.[8] This rule is most consistent with our ad-

---

[7] Some courts have held that a showing of "gross negligence" in a city's failure to train its employees is adequate to make out a claim under § 1983. See, *e. g.*, *Bergquist v. County of Cochise, supra*, at 1370; *Herrera v. Valentine*, 653 F. 2d 1220, 1224 (CA8 1981). But the more common rule is that a city must exhibit "deliberate indifference" towards the constitutional rights of persons in its domain before a § 1983 action for "failure to train" is permissible. See, *e. g.*, *Fiacco v. Rensselaer, supra*, at 326; *Patzner v. Burkett*, 779 F. 2d 1363, 1367 (CA8 1985); *Wellington v. Daniels*, 717 F. 2d 932, 936 (CA4 1983); *Languirand v. Hayden, supra*, at 227.

[8] The "deliberate indifference" standard we adopt for § 1983 "failure to train" claims does not turn upon the degree of fault (if any) that a plaintiff must show to make out an underlying claim of a constitutional violation. For example, this Court has never determined what degree of culpability must be shown before the particular constitutional deprivation asserted in this case—a denial of the due process right to medical care while in detention—is established. Indeed, in *Revere v. Massachusetts General Hospital*, 463 U. S. 239, 243–245 (1983), we reserved decision on the question whether something less than the Eighth Amendment's "deliberate indifference" test may be applicable in claims by detainees asserting violations of their due process right to medical care while in custody.

We need not resolve here the question left open in *Revere* for two reasons. First, petitioner has conceded that, as the case comes to us, we

monition in *Monell*, 436 U. S., at 694, and *Polk County* v. *Dodson*, 454 U. S. 312, 326 (1981), that a municipality can be liable under § 1983 only where its policies are the "moving force [behind] the constitutional violation." Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983. As JUSTICE BRENNAN's opinion in *Pembaur* v. *Cincinnati*, 475 U. S. 469, 483–484 (1986) (plurality) put it: "[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. See also *Oklahoma City* v. *Tuttle*, 471 U. S., at 823 (opinion of REHNQUIST, J.). Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality—a "policy" as defined by our prior cases—can a city be liable for such a failure under § 1983.

*Monell*'s rule that a city is not liable under § 1983 unless a municipal policy causes a constitutional deprivation will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible.[9] That much

---

must assume that respondent's constitutional right to receive medical care was denied by city employees—whatever the nature of that right might be. See Tr. of Oral Arg. 8–9. Second, the proper standard for determining when a municipality will be liable under § 1983 for constitutional wrongs does not turn on any underlying culpability test that determines when such wrongs have occurred. Cf. Brief for Respondent 27.

[9] The plurality opinion in *Tuttle* explained why this must be so:

"Obviously, if one retreats far enough from a constitutional violation some municipal 'policy' can be identified behind almost any . . . harm inflicted by a municipal official; for example, [a police officer] would never have killed Tuttle if Oklahoma City did not have a 'policy' of establishing a police force. But *Monell* must be taken to require proof of a city policy different in kind from this latter example before a claim can be sent to a jury on the theory

may be true. The issue in a case like this one, however, is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy." It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.[10] In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.[11]

In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may

---

that a particular violation was 'caused' by the municipal 'policy.'" 471 U. S., at 823. Cf. also *id.*, at 833, n. 9 (opinion of BRENNAN, J.).

[10] For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, see *Tennessee* v. *Garner*, 471 U. S. 1 (1985), can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

It could also be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are "deliberately indifferent" to the need.

[11] The record indicates that city did train its officers and that its training included first-aid instruction. See App. to Pet. for Cert. 4a. Petitioner argues that it could not have been obvious to the city that such training was insufficient to administer the written policy, which was itself constitutional. This is a question to be resolved on remand. See Part IV, *infra*.

have resulted from factors other than a faulty training program. See *Springfield* v. *Kibbe*, 480 U. S., at 268 (O'CONNOR, J., dissenting); *Oklahoma City* v. *Tuttle, supra*, at 821 (opinion of REHNQUIST, J.). It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury. Thus in the case at hand, respondent must still prove that the deficiency in training actually caused the police officers' indifference to her medical needs.[12] Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect? Predicting how a hypothetically well-trained officer would have acted under the circumstances may not be an easy task for the factfinder, particularly since matters of judgment may be involved, and since officers who are well trained are not free from error and perhaps might react very much like the untrained officer in similar circumstances. But judge and jury, doing their respective jobs, will be adequate to the task.

To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983.

---

[12] Respondent conceded as much at argument. See Tr. of Oral Arg. 50–51; cf. also *Oklahoma City* v. *Tuttle, supra*, at 831 (opinion of BRENNAN, J.).

In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident. See *Oklahoma City* v. *Tuttle,* 471 U. S., at 823 (opinion of REHNQUIST, J.). Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities—a result we rejected in *Monell,* 436 U. S., at 693–694. It would also engage the federal courts in an endless exercise of second-guessing municipal employee-training programs. This is an exercise we believe the federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism. Cf. *Rizzo* v. *Goode,* 423 U. S. 362, 378–380 (1976).

Consequently, while claims such as respondent's—alleging that the city's failure to provide training to municipal employees resulted in the constitutional deprivation she suffered—are cognizable under § 1983, they can only yield liability against a municipality where that city's failure to train reflects deliberate indifference to the constitutional rights of its inhabitants.

IV

The final question here is whether this case should be remanded for a new trial, or whether, as petitioner suggests, we should conclude that there are no possible grounds on which respondent can prevail. See Tr. of Oral Arg. 57–58. It is true that the evidence in the record now does not meet the standard of § 1983 liability we have set forth above. But, the standard of proof the District Court ultimately imposed on respondent (which was consistent with Sixth Circuit precedent) was a lesser one than the one we adopt today, see Tr. 4–389—4–390. Whether respondent should have an opportunity to prove her case under the "deliberate indifference" rule we have adopted is a matter for the Court of Appeals to deal with on remand.

## V

Consequently, for the reasons given above, we vacate the judgment of the Court of Appeals and remand this case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BRENNAN, concurring.

The Court's opinion, which I join, makes clear that the Court of Appeals is free to remand this case for a new trial.

JUSTICE O'CONNOR, with whom JUSTICE SCALIA and JUSTICE KENNEDY join, concurring in part and dissenting in part.

I join Parts I and II and all of Part III of the Court's opinion except footnote 11, see *ante*, at 390, n. 11. I thus agree that where municipal policymakers are confronted with an obvious need to train city personnel to avoid the violation of constitutional rights and they are deliberately indifferent to that need, the lack of necessary training may be appropriately considered a city "policy" subjecting the city itself to liability under our decision in *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978). As the Court observes, "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under [42 U. S. C.] § 1983." *Ante*, at 389. I further agree that a § 1983 plaintiff pressing a "failure to train" claim must prove that the lack of training was the "cause" of the constitutional injury at issue and that this entails more than simply showing "but for" causation. *Ante*, at 392. Lesser requirements of fault and causation in this context would "open municipalities to unprecedented liability under § 1983," *ante*, at 391, and would pose serious federalism concerns. *Ante*, at 392.

My single point of disagreement with the majority is thus a small one. Because I believe, as the majority strongly hints,

see *ibid.*, that respondent has not and could not satisfy the fault and causation requirements we adopt today, I think it unnecessary to remand this case to the Court of Appeals for further proceedings. This case comes to us after a full trial during which respondent vigorously pursued numerous theories of municipal liability including an allegation that the city had a "custom" of not providing medical care to detainees suffering from emotional illnesses. Respondent thus had every opportunity and incentive to adduce the type of proof necessary to satisfy the deliberate indifference standard we adopt today. Rather than remand in this context, I would apply the deliberate indifference standard to the facts of this case. After undertaking that analysis below, I conclude that there is no evidence in the record indicating that the city of Canton has been deliberately indifferent to the constitutional rights of pretrial detainees.

I

In *Monell*, the Court held that municipal liability can be imposed under § 1983 only where the municipality, as an entity, can be said to be "responsible" for a constitutional violation committed by one of its employees. "[T]he touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution." 436 U. S., at 690. The Court found that the language of § 1983, and rejection of the "Sherman Amendment" by the 42d Congress, were both strong indicators that the framers of the Civil Rights Act of 1871 did not intend that municipal governments be held vicariously liable for the constitutional torts of their employees. Thus a § 1983 plaintiff seeking to attach liability to the city for the acts of one of its employees may not rest on the employment relationship alone; both fault and causation *as to the acts or omissions of the city itself* must be proved. The Court reaffirms these requirements today.

Where, as here, a claim of municipal liability is predicated upon a failure to act, the requisite degree of fault must be

shown by proof of a background of events and circumstances which establish that the "policy of inaction" is the functional equivalent of a decision by the city itself to violate the Constitution. Without some form of notice to the city, and the opportunity to conform to constitutional dictates both what it does and what it chooses not to do, the failure to train theory of liability could completely engulf *Monell*, imposing liability without regard to fault. Moreover, absent a requirement that the lack of training at issue bear a very close causal connection to the violation of constitutional rights, the failure to train theory of municipal liability could impose "prophylactic" duties on municipal governments only remotely connected to underlying constitutional requirements themselves.

Such results would be directly contrary to the intent of the drafters of § 1983. The central vice of the Sherman Amendment, as noted by the Court's opinion in *Monell*, was that it "impose[d] a species of vicarious liability on municipalities since it could be construed to impose liability even if the municipality *did not know* of an impending or ensuing riot or did not have the wherewithal to do anything about it." 436 U. S., at 692, n. 57 (emphasis added). Moreover, as noted in *Monell*, the authors of § 1 of the Ku Klux Act did not intend to create any new rights or duties beyond those contained in the Constitution. *Id.*, at 684–685. Thus, § 1 was referred to as "reenacting the Constitution." Cong. Globe, 42d Cong., 1st Sess., 569 (1871) (Rep. Edmunds). Representative Bingham, the author of § 1 of the Fourteenth Amendment, saw the purpose of § 1983 as "the enforcement . . . of the Constitution on behalf of every individual citizen of the Republic . . . to the extent of the rights guaranteed to him by the Constitution." *Id.*, at App. 81. See also *Chapman* v. *Houston Welfare Rights Organization*, 441 U. S. 600, 617 (1979) ("[Section] 1 of the Civil Rights Act of 1871 did not provide for any substantive rights—equal or otherwise. As introduced and enacted, it served only to insure that an individual had a cause of action for violations of the Constitu-

tion"). Thus § 1983 is not a "federal good government act" for municipalities. Rather it creates a federal cause of action against persons, including municipalities, who deprive citizens of the United States of their constitutional rights.

Sensitive to these concerns, the Court's opinion correctly requires a high degree of fault on the part of city officials before an omission that is not in itself unconstitutional can support liability as a municipal policy under *Monell*. As the Court indicates, "it may happen that . . . the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Ante*, at 390. Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied. Only then can it be said that the municipality has made "'a deliberate choice to follow a course of action . . . from among various alternatives.'" *Ante*, at 389, quoting *Pembaur* v. *Cincinnati*, 475 U. S. 469, 483–484 (1986).

In my view, it could be shown that the need for training was obvious in one of two ways. First, a municipality could fail to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face. As the majority notes, see *ante*, at 390, n. 10, the constitutional limitations established by this Court on the use of deadly force by police officers present one such situation. The constitutional duty of the individual officer is clear, and it is equally clear that failure to inform city personnel of that duty will create an extremely high risk that constitutional violations will ensue.

The claim in this case—that police officers were inadequately trained in diagnosing the symptoms of emotional illness—falls far short of the kind of "obvious" need for training

that would support a finding of deliberate indifference to constitutional rights on the part of the city. As the Court's opinion observes, *ante*, at 388–389, n. 8, this Court has not yet addressed the precise nature of the obligations that the Due Process Clause places upon the police to seek medical care for pretrial detainees who have been *physically* injured while being apprehended by the police. See *Revere* v. *Massachusetts General Hospital*, 463 U. S. 239, 246 (1983) (REHNQUIST, J., concurring). There are thus no clear constitutional guideposts for municipalities in this area, and the diagnosis of mental illness is not one of the "usual and recurring situations with which [the police] must deal." *Ante*, at 391. The lack of training at issue here is not the kind of omission that can be characterized, in and of itself, as a "deliberate indifference" to constitutional rights.

Second, I think municipal liability for failure to train may be proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations involving the exercise of police discretion. In such cases, the need for training may not be obvious from the outset, but a pattern of constitutional violations could put the municipality on notice that its officers confront the particular situation on a regular basis, and that they often react in a manner contrary to constitutional requirements. The lower courts that have applied the "deliberate indifference" standard we adopt today have required a showing of a pattern of violations from which a kind of "tacit authorization" by city policymakers can be inferred. See, *e. g.*, *Fiacco* v. *Rensselaer*, 783 F. 2d 319, 327 (CA2 1986) (multiple incidents required for finding of deliberate indifference); *Patzner* v. *Burkett*, 779 F. 2d 1363, 1367 (CA8 1985) ("[A] municipality may be liable if it had notice of prior misbehavior by its officers and failed to take remedial steps amounting to deliberate indifference to the offensive acts"); *Languirand* v. *Hayden*, 717 F. 2d 220, 227–228 (CA5 1983) (municipal liability for failure to train requires "evidence at least of a pattern of similar

incidents in which citizens were injured or endangered"); *Wellington* v. *Daniels*, 717 F. 2d 932, 936 (CA4 1983) ("[A] failure to supervise gives rise to § 1983 liability, however, only in those situations where there is a history of widespread abuse. Only then may knowledge be imputed to the supervisory personnel").

The Court's opinion recognizes this requirement, see *ante*, at 390, and n. 10, but declines to evaluate the evidence presented in this case in light of the new legal standard. *Ante*, at 392. From the outset of this litigation, respondent has pressed a claim that the city of Canton had a custom of denying medical care to pretrial detainees with emotional disorders. See Amended Complaint ¶ 28, App. 27. Indeed, up to and including oral argument before this Court, counsel for respondent continued to assert that respondent was attempting to hinge municipal liability upon "both a custom of denying medical care to a certain class of prisoners, and a failure to train police that led to this particular violation." Tr. of Oral Arg. 37–38. At the time respondent filed her complaint in 1980, it was clear that proof of the existence of a custom entailed a showing of "practices . . . so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144, 168 (1970); see also *Garner* v. *Memphis Police Department*, 600 F. 2d 52, 54–55, and n. 4 (CA6 1979) (discussing proof of custom in light of *Monell*).

Whatever the prevailing standard at the time concerning liability for failure to train, respondent thus had every incentive to adduce proof at trial of a pattern of violations to support her claim that the city had an unwritten custom of denying medical care to emotionally ill detainees. In fact, respondent presented no testimony from any witness indicating that there had been past incidents of "deliberate indifference" to the medical needs of emotionally disturbed detainees or that any other circumstance had put the city on actual or constructive notice of a need for additional training in this

regard. At trial, David Maser, who was Chief of Police of the city of Canton from 1971 to 1980, testified without contradiction that during his tenure he received no complaints that detainees in the Canton jails were not being accorded proper medical treatment. Tr. 4–347—4–348. Former Officer Cherry, who had served as a jailer for the Canton Police Department, indicated that he had never had to seek medical treatment for persons who were emotionally upset at the prospect of arrest, because they usually calmed down when a member of the department spoke with them or one of their family members arrived. *Id.*, at 4–83—4–84. There is quite simply nothing in this record to indicate that the city of Canton had any reason to suspect that failing to provide this kind of training would lead to injuries of any kind, let alone violations of the Due Process Clause. None of the Courts of Appeals that already apply the standard we adopt today would allow respondent to take her claim to a jury based on the facts she adduced at trial. See *Patzner* v. *Burkett, supra,* at 1367 (summary judgment proper under "deliberate indifference" standard where evidence of only single incident adduced); *Languirand* v. *Hayden, supra,* at 229 (reversing jury verdict rendered under failure to train theory where there was no evidence of prior incidents to support a finding that municipal policymakers were "consciously indifferent" to constitutional rights); *Wellington* v. *Daniels, supra,* at 937 (affirming judgment notwithstanding verdict for municipality under "deliberate indifference" standard where evidence of only a single incident was presented at trial); cf. *Fiacco* v. *Rensselaer, supra,* at 328–332 (finding evidence of "deliberate indifference" sufficient to support jury verdict where a pattern of similar violations was shown at trial).

Allowing an inadequate training claim such as this one to go to the jury based upon a single incident would only invite jury nullification of *Monell.* "To infer the existence of a city policy from the isolated misconduct of a single, low-level officer, and then to hold the city liable on the basis of that policy,

would amount to permitting precisely the theory of strict *respondeat superior* liability rejected in *Monell*." *Oklahoma City* v. *Tuttle*, 471 U. S. 808, 831 (1985) (BRENNAN, J., concurring in part and concurring in judgment). As the authors of the Ku Klux Act themselves realized, the resources of local government are not inexhaustible. The grave step of shifting those resources to particular areas where constitutional violations are likely to result through the deterrent power of § 1983 should certainly not be taken on the basis of an isolated incident. If § 1983 and the Constitution require the city of Canton to provide detailed medical and psychological training to its police officers, or to station paramedics at its jails, other city services will necessarily suffer, including those with far more direct implications for the protection of constitutional rights. Because respondent's evidence falls far short of establishing the high degree of fault on the part of the city required by our decision today, and because there is no indication that respondent could produce any new proof in this regard, I would reverse the judgment of the Court of Appeals and order entry of judgment for the city.